UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | |
| | : | Case No. 14-7471 (VB) & 14-7472 (VB) |
| MPM SILICONES, LLC, *et al*.,[1] | : | Case No. 14-7492 (VB) |
| | : | |
| Reorganized Debtors. | : | Confirmed |
| | : | |
| | : | Judge Vincent L. Briccetti |
| | : | |
| | : | |
| | : | |
| | : | |
| U.S. BANK NATIONAL ASSOCIATION, | : | |
| AS INDENTURE TRUSTEE, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILMINGTON SAVINGS FUND SOCIETY, | : | |
| FSB, AS INDENTURE TRUSTEE; | : | |
| MOMENTIVE PERFORMANCE | : | Case No. 14-7471 (VB) & 14-7472 (VB) |
| MATERIALS INC., MOMENTIVE | : | |
| PERFORMANCE MATERIALS | : | |
| WORLDWIDE INC., MOMENTIVE | : | |
| PERFORMANCE MATERIALS USA INC., | : | |
| JUNIPER BOND HOLDINGS I LLC, | : | |
| JUNIPER BOND HOLDINGS II LLC, | : | |
| JUNIPER BOND HOLDINGS III LLC, | : | |
| JUNIPER BOND HOLDINGS IV LLC, | : | |
| MOMENTIVE PERFORMANCE | : | |
| MATERIALS QUARTZ, INC., MPM | : | |
| SILICONES, LLC, MOMENTIVE | : | |
| PERFORMANCE MATERIALS SOUTH | : | |
| AMERICA INC., MOMENTIVE | : | |

---

[1] The last four digits of the taxpayer identification numbers of the Reorganized Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC (9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones, LLC (5481). The Reorganized Debtors' executive headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

| | |
|---|---|
| PERFORMANCE MATERIALS CHINA SPV INC., | : : : : |
| Appellees. | : |
| BOKF, NA, solely as Trustee for the MPM Escrow LLC and MPM Finance Escrow Corp. 8.875% First Priority Senior Secured Notes due 2020; WILMINGTON TRUST, N.A., solely as Trustee for the Momentive Performance Materials Inc. 10% Senior Secured Notes due 2020, | : : : : : : : : : Case No. 14-7492 (VB) : : |
| Appellants, | : : |
| v. | : : : |
| MOMENTIVE PERFORMANCE MATERIALS INC., MOMENTIVE PERFORMANCE MATERIALS WORLDWIDE INC., MOMENTIVE PERFORMANCE MATERIALS USA INC., JUNIPER BOND HOLDINGS I LLC, JUNIPER BOND HOLDINGS II LLC, JUNIPER BOND HOLDINGS. III LLC, JUNIPER BOND HOLDINGS IV LLC, MOMENTIVE PERFORMANCE MATERIALS QUARTZ, INC., MPM SILICONES, LLC, MOMENTIVE PERFORMANCE MATERIALS SOUTH AMERICA INC., MOMENTIVE PERFORMANCE MATERIALS CHINA SPV INC., | : : : : : : : : : : : : : : : : : : : : : : : : : |
| Appellees. | : : |

**DECLARATION OF RANDALL S. EISENBERG IN SUPPORT OF REORGANIZED DEBTORS' MOTION TO DISMISS APPEALS AS EQUITABLY MOOT**

I, Randall S. Eisenberg, hereby declare, pursuant to 28 U.S.C. § 1746, under

penalty of perjury:

1.      I am a Managing Director of AlixPartners, LLP ("**AlixPartners**"), which has a place of business at 40 West 57th Street, 29th Floor, New York, New York, 10019. I am authorized to execute this declaration.

2.      I submit this declaration (the "**Declaration**") in support of the *Motion of the Reorganized Debtors to Dismiss Appeals of U.S. Bank, BOKF, NA and Wilmington Trust, N.A. as Equitably Moot* (the "**Motion to Dismiss**").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my direct personal knowledge of the operations and finances of the above-captioned reorganized debtors (together, "**MPM**" or the "**Reorganized Debtors**"); (ii) information learned from my review of relevant documents, including, without limitation, the *Joint Chapter 11 Plan of Reorganization for Momentive Performance Materials Inc. and Its Affiliated Debtors* (including all exhibits thereto and as amended, modified or supplemented from time to time, the "**Plan**");[2] and/or (iii) information provided to me by members of the Reorganized Debtors' management, employees of AlixPartners working directly with me or under my supervision, direction or control and/or from MPM's other professionals and advisors.  I have been consistently involved in MPM's restructuring and the development of the Plan.  I have reviewed and am familiar with the relevant terms and provisions of the Plan and the numerous intricate transactions that occurred on, or are contemplated to occur after, the Effective Date (as defined below).  As such, I am fully aware of the details regarding the consummation of the Plan, implementation of the Plan provisions and MPM's emergence from chapter 11.  I am not being compensated specifically for this testimony other than through payments received by AlixPartners as a professional retained by the Reorganized Debtors.  I am authorized to submit

---

[2]      All capitalized terms not defined herein shall have the meaning(s) ascribed to them in the Plan, Disclosure Statement or Motion to Dismiss, as applicable.

this Declaration in support of the Motion to Dismiss.  If called upon to testify, I could and would testify to the facts set forth herein.

## I.      Background and Qualifications

4.      I have held the position of Managing Director at AlixPartners since January 2013, where I co-lead its Transformation and Restructuring Advisory Practice which is part of the Turnaround and Restructuring Services Group.  Prior to that time, I was a Senior Managing Director in FTI Consulting Inc.'s ("**FTI**") Corporate Finance Practice.  I was a member of FTI's Corporate Finance Practice leadership team during most of the approximately 10 year period following the acquisition of PricewaterhouseCoopers, LLP's Business Recovery Services U.S. Practice by FTI in September 2002.   Prior to this acquisition, I was a Partner at PricewaterhouseCoopers, LLP.

5.      For more than 20 years, I have advised senior management and boards of directors of companies in numerous industries to devise and implement sound turnaround and restructuring strategies in out-of-court turnarounds, chapter 11 restructurings, and foreign insolvency proceedings.  In addition, I have advised creditor constituents who often become the new owners of a business upon consummation of a restructuring.  During the course of my career, I have been involved in numerous large and complex restructurings, including, but not limited to, Anthracite Capital, Inc., Delphi Corporation, Jackson Hewitt, Kmart Corporation, Koosharem, LLC, Planet Hollywood International, Inc., Rotech Healthcare, Inc., RSL Communications, Ltd., US Airways Group, Inc., Vertis, Inc. and Visteon Corporation.  I am often called upon to advise on complex issues attendant to maximizing or preventing diminution in enterprise value.

6.      My credentials also include:

(a) certification as a Turnaround Professional by the Association of Certified Turnaround Professionals (now part of the Turnaround Management Association) and as a Certified Public Accountant licensed in the states of New York and California;

(b) serving as a past Chairman of the Turnaround Management Association and past President of the Association for Certified Turnaround Professionals, which was merged into the Turnaround Management Association in 2007;

(c) induction as a Fellow into both the American College of Bankruptcy and the International Insolvency Institute;

(d) previously serving as an Adjunct Professor at the John E. Anderson School of Management at the University of California Los Angeles and the University of Southern California School of Accounting, where I taught cost accounting in their respective graduate school programs;

(e) recipient of a Bachelor of Science degree from the University of the Pacific and a Masters in Business Administration degree from the Kellogg School of Management at Northwestern University; and

(f) writing and speaking on a multitude of topics pertaining to the implementation of effective turnaround and restructuring strategies.

## II.     The Plan Has Been Substantially Consummated

7.      The Plan was global in nature, a product of extensive negotiations among the Plan Support Parties and the Debtors, and made possible by the Plan Support Parties' commitment to (i) fund $600 million in new equity financing, (ii) vote in favor of a Plan providing a full recovery to General Unsecured Creditors despite the fact that the Plan Support Parties are not receiving a full recovery and (iii) accept equity on account of their secured claims.  Absent these significant concessions and the support of the Plan Support Parties, the now consummated restructuring would not have been possible.   The integrated nature of the Plan transactions is evident from the key consent rights in favor of the Plan Support Parties contained therein.  Any modification to the Plan requires the consent of the Requisite Investors[3] and all of the Plan

---

[3]      The Requisite Investors are "(a) members of the Ad Hoc Committee of Second Lien Noteholders holding at least a majority of the aggregate Backstop Commitments provided by all members of the Ad Hoc

Documents must be in form and substance satisfactory to the Requisite Investors as a condition precedent to the effectiveness of the Plan.  (Plan, §§ 11.1(a), (b), (g) and 14.6.)  These provisions were included in the Plan so that the Plan Support Parties could ensure that the bargain they struck was maintained, absent which consents the Debtors would have been unable to consummate the Plan.

8.      The Plan became effective on October 24, 2014 (the "**Effective Date**").  On the Effective Date, the Reorganized Debtors emerged from chapter 11 protection and began conducting business as a reorganized company.  Occurrence of the Effective Date triggered a number of interrelated, complex transactions and other events with far-reaching consequences that are exceptionally difficult to unwind.  Specifically, on or shortly following the Effective Date, MPM has, among other things:

> (a)      cancelled its previously issued securities and the indentures governing such securities, including, but not limited to, the First Lien Notes, 1.5 Lien Notes, Second Lien Notes, Senior Subordinated Notes, the indentures for each of the foregoing and the prepetition equity interests in MPM;
>
> (b)      issued $1.1 billion in principal amount of Replacement First Lien Notes and $250 million in principal amount of Replacement 1.5 Lien Notes and taken various interrelated steps necessary for such issuances, including, but not limited to (i) executing and delivering all agreements, guarantees, security agreements and other documents and instruments relating to the new notes, (ii) obtaining CUSIP numbers, (iii) making such notes eligible to be deposited into the Depository Trust Company and (iv) entering into other necessary transactions with the applicable trustees for the new notes;
>
> (c)      collected approximately $600 million in proceeds from 154 parties which participated in the Rights Offering;
>
> (d)      issued 47,989,000 shares of New Common Stock to (i) holders of Second Lien Notes in exchange for their Second Lien Notes, (ii) those holders of Second Lien Notes that participated in the Rights Offering in exchange for investing $600 million in the Rights Offering and (iii) the Backstop Parties

---

Committee of Second Lien Noteholders as of the date on which the consent of such members is solicited; and (b) Apollo …."  Plan, § 1.154.

as an equity backstop fee of approximately $30 million worth of New Common Stock;

(e)     exchanged the New Common Stock for TopHoldCo common stock;

(f)     assumed over 600 executory contracts and/or unexpired leases and is in the process of disbursing in excess of $36 million in cure amounts to over 135 contract counterparties, a portion of which has already been disbursed;

(g)     is in the process of disbursing in excess of $7.2 million in cash to more than 790 unsecured creditors on account of their claims, a portion of which has already been disbursed, and has also commenced negotiations with certain unsecured creditors to resolve disputes regarding more than $14.2 million in additional unsecured claims;

(h)     is in the process of disbursing approximately (i) $585,000 in cash to more than forty holders of Administrative Expense Claims, (ii) $120,000 in cash to two holders of secured claims, and (iii) $20.8 million in cash in satisfaction of the Cash Flow Facility, a portion of which has already been disbursed, and is also in the process of resolving disputes regarding approximately $5.6 million of Administrative Expense Claims and secured claims;

(i)     disbursed approximately $2.4 million in cash to holders of First Lien Notes and $625,000 in cash to holders of 1.5 Lien Notes on account of accrued interest due under the First Lien Notes and the 1.5 Lien Notes, respectively;

(j)     disbursed approximately $8.9 million in cash to holders of Holdings PIK Note Claims and their advisors;

(k)     is in the process of disbursing approximately $50.9 million in cash for professional fees for the professionals retained by (i) MPM, (ii) the Plan Support Parties, (iii) the First Lien Indenture Trustee, (iv) the 1.5 Lien Indenture Trustee, (v) the unsecured creditors committee, (vi) lenders in connection with the capital raised for the Incremental Facility and (vii) the U.S. Trustee for services rendered through the Effective Date, a portion of which has already been disbursed;

(l)     formed two new holding companies and undertook various steps related to their formation and integration into MPM's new capital structure, including (i) filing certificates of incorporation and bylaws, (ii) issuing board resolutions and (iii) obtaining Tax ID numbers;

(m)     converted certain of MPM's subsidiaries from corporations to LLCs and filed related transactional documents with the Delaware Secretary of State;

(n) filed restated charters for certain other MPM subsidiaries with the Delaware Secretary of State;

(o) appointed a new board of directors and new officers for MPM;

(p) began the process of dissolving old MPM's holding company structure;

(q) paid off the $300 million DIP Term Loan in cash, released all liens and security interests related thereto and terminated the DIP Term Loan Facility;

(r) repaid the U.S. Dollar and Euro amounts outstanding under the $270 million DIP ABL Facility and converted such facility into the New ABL Facility;

(s) entered into an amendment of the Shared Services Agreement between MPM and Momentive Specialty Chemicals, Inc.;

(t) terminated the Existing Management Agreement with Apollo;

(u) obtained necessary regulatory approvals from the FCC for the transfer of certain licenses;

(v) filed documents with the SEC and distributed other communications to MPM's customers, employees, vendors and other stakeholders providing details of the consummated restructuring; and

(w) began significant negotiations and/or entered into agreements with customers, suppliers and employees under the premise that MPM has emerged from chapter 11 with a significantly deleveraged capital structure.

9. As a result of all of the foregoing, all equity interests in Momentive Performance Materials, Inc. proposed to be cancelled under the Plan have been cancelled. Reorganized MPM has assumed all of the business operations and the property addressed in the Plan, and MPM has commenced – and with respect to many creditors, completed – distributions under the Plan. Additionally, as stated herein, MPM has created two new holding companies in its capital structure, converted certain subsidiaries from corporations to LLCs, began the dissolution of the previous holding company structure and filed a number of related corporate documents with the Delaware Secretary of State to effectuate the foregoing transactions.

10.     On the Effective Date, MPM used approximately $510 million of the proceeds of the $600 million Rights Offering to make distributions under the Plan to various creditors, including, *inter alia*:

(a)     approximately $302.3 million to the lenders under the DIP Term Loan;

(b)     approximately $145.4 million to the lenders under the DIP ABL Facility;

(c)     approximately $20.8 million to the lenders under the Cash Flow Facility;

(d)     approximately $24.0 million in fees and expenses to over a dozen different professionals;

(e)     approximately $10.9 million in cure payments to assume the Shared Services Agreement with Momentive Specialty Chemicals, Inc.;

(f)     approximately $2.4 million and $625,000 in post-petition interest to the holders of First Lien Notes and 1.5 Lien Notes, respectively; and

(g)     approximately $3.1 million in fees associated with the commitment for the Incremental Facility.

11.     Since the Effective Date, MPM made or expects to make additional payments pursuant to the Plan aggregating approximately $59 million from the proceeds of the Rights Offering including:

(a)     over $24.2 million in undisputed contract cure claims to various contract counterparties;

(b)     approximately $585,000 in undisputed administrative expense claims and $120,000 in undisputed secured claims;

(c)     approximately $7.2 million in undisputed general unsecured claims; and

(d)     approximately $27 million in additional professional fees.

12.     In addition, MPM has approximately $21.4 million in disputed secured claims, administrative expense claims, contract cure claims and general unsecured claims.  As these disputes are resolved with the appropriate counterparties, MPM intends to further distribute proceeds of the Rights Offering to satisfy such claims.

13.     Without the $600 million Rights Offering, MPM could not have made such Plan distributions and still have adequate liquidity for operations upon emergence.  In addition, based on the actions taken upon the Effective Date and immediately thereafter, MPM has completely revamped its entire capital structure.

14.     In connection with its emergence, MPM is also preparing financial statements in accordance with Generally Accepted Accounting Principles (GAAP) to be published in reliance on the Plan as approved by the Bankruptcy Court.  These financial statements are being prepared to reflect the fair value of the assets and the post-emergence equity value of MPM following "fresh start" accounting requirements, such that the public may rely on these statements in trading and holding the securities of MPM, conducting business with MPM and in regulating the activities of MPM.

15.     Furthermore, I have read the *Declaration of Brian D. Berger In Support of Reorganized Debtors' Motion to Dismiss Appeals as Equitably Moot* filed concurrently herewith and I agree with his conclusion that MPM's operations would be materially impacted if the Appellants' requested relief is granted.  As a reorganized company with a fully restructured and significantly deleveraged balance sheet, MPM has begun the process of renegotiating contracts with customers and vendors as well as hiring employees.  Prior to MPM's emergence from chapter 11, certain of these customers, vendors and employees withheld entering into new contracts or employment agreements out of concern for MPM's long term viability.  Pricing, terms and compensation are being negotiated and determined based on the capital structure of the consummated Plan and with the understanding that MPM is no longer in chapter 11.

16.     Additionally, MPM has a new Chief Executive Officer, Chief Financial Officer and General Counsel in place as of the Effective Date.  Prior to the Effective Date, MPM shared

these officer positions with MSC through the Shared Services Agreement by employing the same people for these officer positions. Now, however, these former shared officers remain officers for only MSC and no longer provide executive leadership to MPM.

### III. Unwinding the Substantially Consummated Plan Would Cause Significant Harm to MPM, Its Creditors and Other Third Parties

17.     If the Court were to grant the relief requested by the Appellants, and in so doing unravel the substantially consummated Plan, significant harm would be imposed upon MPM, its creditors and countless other third parties. As detailed above, hundreds of millions of dollars in cash and securities have been disbursed, with additional sums to follow to hundreds of different counterparties, and MPM has effectuated a variety of complex transactions to implement the Plan.

18.     Additionally, reversing the Confirmation Order would force the Debtors back into bankruptcy, which would require extensive renegotiation by the Debtors and the Plan Support Parties, among others, to develop a new plan of reorganization. There would be no guarantee that the Plan Support Parties would be willing to negotiate a new Plan or commit to an equity investment, as the key bargained-for terms of the Plan would likely materially change. The likely result would be a prolonged bankruptcy that could tie up MPM's resources and adversely impact the value of the entire enterprise. Furthermore, MPM's post-emergence efforts of reestablishing credibility and trust with customers, employees and vendors would likely be undermined due to the uncertainty that would be created by forcing MPM back into bankruptcy, adversely impacting operations.

### A. Any Relief Available to the Senior Subordinated Trustee Would Inequitably Disrupt the Plan

19.     If holders of Senior Subordinated Notes were ultimately granted equity on account of their claims, such additional equity would dilute the value received by holders of

Second Lien Notes on account of their Second Lien Note Claims and on account of the $600 million they provided to MPM in connection with the Rights Offering, by increasing the number of shares outstanding and decreasing the per share value of the Top HoldCo Stock.  The dilution of their equity interests would significantly alter the terms by which the holders of Second Lien Notes agreed to in providing $600 million in connection with the Rights Offering and the conversion of their Second Lien Note Claims to equity.  If any award of cash consideration was to be provided to former holders of Senior Subordinated Notes, the value of the equity in the reorganized MPM will decrease from that which was contemplated under the consummated Plan, therefore reducing the value of the equity received by holders of Second Lien Notes and the Rights Offering participants.  Furthermore, depending on the amount of such cash consideration, MPM may be left without sufficient liquidity to conduct operations absent additional sources of financing.

20.     This result would upset the carefully negotiated Plan by materially altering the terms of the consideration received by holders of Second Lien Notes without their consent and violating the protections provided to the holders of the Second Lien Notes under the terms of the Restructuring Support Agreement and the Plan.  It is also unlikely that holders of Second Lien Notes would vote to accept a new plan with the terms revised to reflect the relief sought by the holders of the Subordinated Notes and agree to invest $600 million in additional equity capital.

21.     As of the Petition Date, there was $382 million in principal amount outstanding of the Senior Subordinated Notes and therefore, payment in full in cash to holders of the Senior Subordinated Notes would not be feasible under MPM's current capital structure.  Accordingly, should MPM be required to make a substantial cash payment to holders of Senior Subordinated Notes, MPM would be required to raise cash via either additional new debt or new equity

financing.  If new debt were to be raised, the cash required to service  such additional loans would affect the cash available to MPM intended to be used for post-emergence operational expenses and investments.  Even if such new capital could be raised, it would reduce recoveries to holders of Second Lien Notes whose contributions of equity financing allowed for the consummation of the Plan.

### B. Any Relief Available to the First and 1.5 Lien Trustees Would Inequitably Disrupt the Plan

22.     It is my understanding that the First and 1.5 Lien Trustees seek the following relief in their Appeal: (a) payment of a "make-whole" premium they argue is due under their respective indentures, and (b) increased interest rates on their respective Replacement Notes.  If the make-whole premium is required to be paid by increasing the principal amount of the Replacement Notes or if the interest rates under the Replacement Notes were to be increased, such relief would require material modifications to the economic terms of the indentures governing the Replacement Notes (the "Replacement Notes Indentures").  On the Effective Date, the Debtors and the Plan Support Parties determined that the conditions precedent to effectiveness of the Plan were satisfied (or waived any such condition that had not been satisfied).   In connection therewith, such parties approved key documents such as the Replacement Notes Indentures based on the facts and circumstances available at that time (including the principal amount and interest rate of the Replacement Notes set forth therein) and the Bankruptcy Court's rulings in connection with confirmation of the Plan.   After the Bankruptcy Court's decision on confirmation issues, MPM consulted with the Plan Support Parties regarding the higher rates of interest for the Replacement Notes required by the Bankruptcy Court and amended the Plan to include such higher interest rates only after receiving the express consent of the Plan Support Parties.

23.     To the extent that MPM is required to make a cash payment with respect to the First and 1.5 Lien Trustees' make-whole claims, MPM would have to obtain additional capital in the form of either debt or equity to maintain its contemplated liquidity.  There is no guarantee that such financing would be available to MPM at all or on reasonable terms.  To maintain the available liquidity as contemplated at the Effective Date, MPM would need to seek financing in the range of $150 to $200 million, which would add significant additional liabilities or dilutive equity to MPM's balance sheet.  Similarly, if MPM is required to increase the principal amount of the Replacement Notes, this would also significantly increase MPM's liabilities and require MPM to use additional cash,[4] which would otherwise be available to be used for general operational purposes.  These potential new debt obligations and related operational harm would significantly undercut the value of the equity that the Plan Support Parties acquired in reliance on the fact that there would be no material change to the terms of the Replacement Notes absent their consent.

24.     Payment of a make-whole premium to the holders of First Lien Notes and 1.5 Lien Notes would reduce the equity value of MPM by forcing it to incur in excess of $200 million in additional liabilities on its balance sheet.  Holders of Second Lien Notes received distributions of equity in MPM which had a total value of approximately $240 million and subscribers to the Rights Offering purchased equity in reorganized MPM which had a total value

---

[4]     If MPM was required to increase the interest rate for the Replacement Notes, each additional percentage point of additional interest above the current interest rates in the Replacement Note Indentures would result in $13.5 million per year of additional cash expense.  If the make whole claim is deemed valid, at the current interest rates in the Replacement Note Indentures, MPM would incur $8.2 million per year of additional cash expense.  Each additional percentage point of interest on the make whole amount above the current interest rates in the Replacement Note Indentures would result in incremental cash expense of $2.0 million per year.

of approximately $706 million.[5]  If now, MPM's total equity value is reduced because of the incurrence of significant additional debt, the holders of Second Lien Notes and subscribers to the Rights Offering will own stock worth significantly less because of the lower equity value of MPM and receive a lower recovery than was contemplated in the Plan.

## IV.    CONCLUSION

25.    MPM has effectuated multiple complex transactions in order to consummate the Plan.  Unwinding these transactions would be nearly impossible and placing MPM back into chapter 11 would potentially cause catastrophic harm to MPM.  Additionally, granting the relief requested by the Appellants would materially and inequitably alter the terms that the Plan Support Parties bargained for.

Respectfully submitted,

/s/ Randall S. Eisenberg
Randall S. Eisenberg
Managing Partner
AlixPartners LLP

Dated: November 11, 2014

---

[5]    The Rights Offering provided subscribers the right to purchase the New Common Stock at a  fifteen percent (15%) discount to its equity value, which accounts for the difference between the approximately $706 million in equity value purchased and the $600 million in cash raised by the Rights Offering.