UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re: | : |
| | : Case No. 14-7471 (VB) & 14-7472 (VB) |
| MPM SILICONES, LLC, *et al*.,[1] | : Case No. 14-7492 (VB) |
| | : |
| Reorganized Debtors. | : Confirmed |
| | : |
| | : Judge Vincent L. Briccetti |

---

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, | : |
| | : |
| Appellant, | : |
| | : |
| v. | : |
| | : |
| | : |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, AS INDENTURE TRUSTEE; MOMENTIVE PERFORMANCE MATERIALS INC., MOMENTIVE PERFORMANCE MATERIALS WORLDWIDE INC., MOMENTIVE PERFORMANCE MATERIALS USA INC., JUNIPER BOND HOLDINGS I LLC, JUNIPER BOND HOLDINGS II LLC, JUNIPER BOND HOLDINGS III LLC, JUNIPER BOND HOLDINGS IV LLC, MOMENTIVE PERFORMANCE MATERIALS QUARTZ, INC., MPM SILICONES, LLC, MOMENTIVE PERFORMANCE MATERIALS SOUTH AMERICA INC., MOMENTIVE | : Case No. 14-7471 (VB) & 14-7472 (VB) |

---

[1]     The last four digits of the taxpayer identification numbers of the Reorganized Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC (9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones, LLC (5481).  The Reorganized Debtors' executive headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

| | |
|---|---|
| PERFORMANCE MATERIALS CHINA SPV INC., | : |
| Appellees. | : |
| BOKF, NA, solely as Trustee for the MPM Escrow LLC and MPM Finance Escrow Corp. 8.875% First Priority Senior Secured Notes due 2020; WILMINGTON TRUST, N.A., solely as Trustee for the Momentive Performance Materials Inc. 10% Senior Secured Notes due 2020, | : Case No. 14-7492 (VB) |
| Appellants, | : |
| v. | : |
| MOMENTIVE PERFORMANCE MATERIALS INC., MOMENTIVE PERFORMANCE MATERIALS WORLDWIDE INC., MOMENTIVE PERFORMANCE MATERIALS USA INC., JUNIPER BOND HOLDINGS I LLC, JUNIPER BOND HOLDINGS II LLC, JUNIPER BOND HOLDINGS. III LLC, JUNIPER BOND HOLDINGS IV LLC, MOMENTIVE PERFORMANCE MATERIALS QUARTZ, INC., MPM SILICONES, LLC, MOMENTIVE PERFORMANCE MATERIALS SOUTH AMERICA INC., MOMENTIVE PERFORMANCE MATERIALS CHINA SPV INC., | : |
| Appellees. | : |

**DECLARATION OF BRIAN D. BERGER IN SUPPORT OF REORGANIZED DEBTORS' MOTION TO DISMISS APPEALS AS EQUITABLY MOOT**

I, Brian D. Berger, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1.      I am the Interim Chief Financial Officer and a Director of Momentive Performance Materials Inc. ("**MPMI**"), a corporation incorporated under the laws of Delaware,

and the ultimate parent of the other reorganized debtors and debtors in possession in the above-captioned cases (collectively, with MPMI, the "**Reorganized Debtors**" or "**MPM**").  I joined MPMI as Vice President, Finance of the Silicones and Quartz Division in 2012 and served as Interim President of the Silicones and Quartz Division from August 2013 to March 2014. I submit this declaration (the "**Declaration**") in support of the *Motion of the Reorganized Debtors to Dismiss Appeals of U.S. Bank, BOKF, NA and Wilmington Trust, N.A. as Equitably Moot* (the "**Motion to Dismiss**").

2.      I am one of the individuals responsible for overseeing MPM's financial and operational affairs.   In such capacity, I am familiar with MPM's day-to-day operations, businesses and financial affairs.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my direct personal knowledge of the operations and finances of the Reorganized Debtors; (ii) information learned from my review of relevant documents, including, without limitation, the Joint Chapter 11 Plan of Reorganization for Momentive Performance Materials Inc. and Its Affiliated Debtors (including all exhibits thereto and as amended, modified or supplemented from time to time, the "**Plan**");[2] and/or (iii) opinion based upon experience and knowledge of the Reorganized Debtors' business affairs and financial condition and the advice provided by the Reorganized Debtors' financial professionals.  I am authorized to submit this declaration in support of the Reorganized Debtors.  If called upon to testify, I could and would testify to the facts set forth herein.

---

[2]      All capitalized terms not defined herein shall have the meaning(s) ascribed to them in the Plan, Disclosure Statement or Motion to Dismiss, as applicable.

4.     The effective date of the Plan (the "**Effective Date**") occurred on October 24, 2014.  On that date, MPM emerged from chapter 11 protection and began conducting business as a reorganized company.

**Granting Appellants' Relief Would Add Significant Liabilities to MPM's Balance Sheet**

5.     During the bankruptcy cases, MPM experienced a significant negative impact on its businesses as a result of the bankruptcy.  Specifically, during the second quarter of 2014, there were a number of disruptions relating to (a) certain of MPM's suppliers and their willingness to continue to supply MPM, which created incremental costs for MPM, (b) unexpected employee turnover within MPM, which led to incremental fees related to efforts in recruiting employees to fill open positions, (c) certain of MPM's contract manufacturers and their willingness to continue to manufacture products for MPM, and (d) customers which cancelled orders due to anxiety and uncertainty surrounding the bankruptcy process.  As a result of the consummation of the Plan, MPM became significantly de-leveraged.  Since the Effective Date, as a result of MPM's significantly de-leveraged balance sheet, vendors, customers, and suppliers have shown a renewed commitment and desire to engage in business, and negotiate contracts, with MPM.

6.     Should MPM be forced to incur hundreds of millions of dollars in additional debt due to the outcome of the Appeals, such result will likely create a negative perception in the market for MPM's vendors, suppliers and customers, who have been, or soon will be, engaging in business with MPM in reliance on the consummated Plan.  Based on my communications with certain employees of MPM who interact regularly with MPM's vendors, suppliers and customers, such vendors, suppliers and customers will likely have substantial renewed concern regarding the financial health and long-term stability of MPM if MPM is forced to incur

additional significant liabilities as a result of the Appeals.  Regardless of whether MPM would

have the ability to service such additional significant debt, the perception that MPM's financial

health is uncertain will likely give rise to a tangible adverse impact on MPM's relationship with

its vendors, suppliers and customers, the lifeblood of its operations, which is likely to result in

long-term adverse implications on MPM's revenue and growth prospects as further detailed

herein.

### Hampering MPM's Efforts to Win New Business and Maintain Existing Customers

7.     MPM's customers have complex supply chains, which require strict delivery

schedules and high quality standards.  Given the highly technical nature of MPM's products and

the need for rigorous compliance with manufacturing standards, a customer will often require an

exact set of manufacturing tolerances for MPM's products to ensure compliance with that

customer's production requirements.  Because of the precision required, some customers were

reluctant during the bankruptcy case to rely on MPM as a sole source of supply. In fact, during

the chapter 11 cases certain customers began to either re-source or find multiple sources of

supply over concerns of MPM's stability and significantly leveraged balance sheet.  Since its

emergence from bankruptcy, however, MPM has been able to assuage such concerns by pointing

to its de-levered capital structure and stability as a newly emerged and viable corporate entity.  In

connection with MPM's emergence from bankruptcy, such customers have shown a willingness

to engage in new business with MPM and to taper their previous efforts to increase the

percentage of their resourcing of supply from other vendors.  In addition, customers in many of

MPM's business segments that had delayed the commencement of new product development

efforts with MPM until it emerged from bankruptcy, are now in the process of negotiating the

terms of such product development efforts with MPM.  The main catalyst for these re-opened

negotiations is that customers now feel reassured that MPM, with a delevered balance sheet, is a viable and stable enterprise that can adequately meet all requirements for product development. If, however, MPM incurs hundreds of millions of dollars in additional liabilities stemming from the Appeals, these customers are likely to halt such efforts in negotiating new agreements to develop products and will likely, once again, increase their efforts to source these products through other vendors.  Since product development can take several years, this will likely affect MPM's ability to generate future revenue.  The loss of business or participation in such programs, even on a temporary basis, will have significant long-term adverse implications on MPM's revenue and growth.

8.      Furthermore, certain of MPM's competitors have previously taken advantage of MPM's chapter 11 proceedings in an attempt to gain a competitive advantage.  Not surprisingly, certain of MPM's customers advised MPM of specific instances whereby competitors made reference to MPM's bankruptcy in an attempt to paint a picture of uncertainty and capture market share.  Should MPM be forced to incur substantial additional debt and add leverage to its balance sheet due to the Appeals, MPM's competitors are likely to seize on this fact in discussions with MPM's customers in an attempt to portray MPM as an unstable company with an uncertain future and significantly more liabilities than what was contemplated upon MPM's emergence from bankruptcy.  In fact, even with its post-bankruptcy substantially de-levered balance sheet, MPM's balance sheet is still significantly more leveraged than its competitors. For example, MPM's net debt to EBITDA ratio is 5.3[3] whereas the net debt to EBITDA ratios for Dow Chemical, Wacker and Evonik, certain of MPM's competitors, are 1.8, 1.5 and 0.2,

---

[3]      This is based on estimated "Last Twelve Months (LTM)" September 2014 EBITDA and net debt of $1.2 billion as of the Effective Date.

respectively.  If MPM is required to saddle its balance sheet with even more debt, its net leverage will only increase compared to its competitors, potentially leading to erosion of MPM's competitive position over time.

9.      Furthermore, any doubts of MPM's customers regarding the finality of the Plan and Confirmation Order will be particularly damaging given the timing of certain contract renegotiations.  For example, management estimates that approximately 40-45% of MPM's additives business revenues are derived from annual contracts which are traditionally renegotiated annually in the fourth quarter for transactions taking place in the upcoming year. Likewise, other of MPM's business segments have significant fourth quarter contract renegotiations.  Based on my communications with certain of MPM's business general managers, granting Appellants' requested relief will likely adversely impact these negotiations as customers will extract more stringent and unfavorable terms if the Appeals give rise to additional significant liabilities for MPM.

**Difficulties in Attracting and Retaining the Most Qualified Individuals as Employees**

10.     Due to the nature of its products, MPM requires a highly skilled labor force to properly operate its business.  MPM's bankruptcy made it very difficult and expensive to attract and retain top talent across the enterprise, and now that MPM has emerged from bankruptcy, it is looking to fill many positions which became vacant prior to or during the bankruptcy. Appellants' requested relief will continue to create uncertainty around MPM's liquidity and capital structure, which will hamper efforts to recruit top talent.  MPM's ability to fill such vacant positions and retain top talent is critical to its success.

11.     Attrition has impacted all levels within MPM.  Notably, during the chapter 11 cases, there was an increasing recent trend in resignations of employees holding leadership or

managerial positions.  For example, since June 2014, fifteen (15) employees in key managerial positions (approximately fifteen percent (15%) of the total key managerial positions) resigned from MPM.  MPM is now focused on hiring highly skilled people to fill these positions.  Since MPM's emergence from bankruptcy, prospective employees have begun to show a higher level of interest in such vacant positions.  In fact, after its emergence, MPM was able to hire an employee, who will start in mid-November 2014, to fill a critical Environmental Health and Safety senior leadership position.  Should the relief requested by Appellants, however, be granted, such increased interest in vacant positions will likely subside as prospective employees will likely perceive any relief granted in connection with the Appeals as indicia of  instability or uncertainty regarding the future of MPM's business plan.  Qualified candidates are often aware of the challenges and uncertainty associated with working for a company with a constrained liquidity profile, and are thus hesitant to join as employees.

### Reducing MPM's Leverage in Negotiating Vendor Pricing and Terms

12.    MPM is currently, or will be shortly, negotiating approximately $181 million worth of vendor contracts over the next several months.  These contracts represent approximately 11% of MPM's annual vendor spend.  These contracts are with vendors who supply materials and perform services that are critical to the success of MPM's business plan.  In order to achieve favorable pricing and terms, MPM must convincingly demonstrate to vendors that it will be able to meet required obligations.  Vendors previously expressed concerns regarding entering into long term contracts with or committing to provide future services to a company in bankruptcy.  Should there be doubts regarding the finality of the Confirmation Order, or the stability of MPM given the potential incurrence of hundreds of millions of dollars of additional liabilities, vendors will continue to exert leverage in terms of pricing and payment terms, to the detriment of MPM.

In my opinion, even a marginal reduction in vendor payment terms will materially reduce MPM's projected liquidity, adversely impacting business operations and overall stability.

**Hindering MPM's Ability to Undertake Opportunistic Investments**

13.     If the Appellants' requested relief is granted, it will place MPM in a position where the implementation of opportunistic investments and significant capital projects will likely be constrained.   Whether due to a counterparty's refusal to engage because of uncertainties surrounding MPM's liquidity and/or capital structure, or due to liquidity constraints, MPM's capacities in this regard may become significantly impaired.

14.     MPM has over 1,000 ongoing or planned capital projects related to the improvement of plant reliability, manufacturing efficiency and environmental health and safety. If, due to the Appeals, MPM had to spend additional cash to service additional debt or to pay for additional distributions,   the amount of capital available for MPM to support these projects would be similarly curtailed—which, when coupled with the potential challenges that MPM will face in recruiting necessary talent to support these projects could put many of these projects at risk for delay.   This will likely result in the loss of productivity improvements in the first full year of MPM's post-emergence business plan and also affect operational efficiency in future periods.

**Continuing Distractions to MPM's Management**

15.     If the Appellants ultimately succeed in their Appeals, and MPM is forced to make changes to the Plan, MPM's management will be forced to spend a significant amount of time in effectuating the resolution of the Appeals, which could include re-negotiating a new Plan, seeking additional financing, consulting with financial and legal advisors, and communicating with key constituents, vendors, customers, and employees.   This ongoing distraction to MPM's

management will significantly divert their attention from their primary responsibilities of continuing to drive the company's growth, productivity, and profitability.

### Conclusion

16.     If the Court were to grant the relief requested by Appellants, and in so doing, add significant liabilities to MPM's balance sheet, significant harm would be imposed upon MPM. Specifically, if MPM is forced to suddenly incur substantial additional debt, the resulting perception of uncertainty in MPM's stability and business plan would have significant adverse consequences for MPM.

Respectfully submitted,

 /s/ Brian D. Berger
Brian D. Berger
Interim Chief Financial Officer, Momentive
Performance Materials Inc.

Dated: November 11, 2014